UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

                              Case No. 17-cr-20787

            Plaintiff,

                              Hon. Linda V. Parker
v.                                 United States District Judge

JEROME A. WILSON,

            Defendant.

---

### United States' Response Opposing the Defendant's Renewed Motion for Compassionate Release

---

Defendant Jerome Wilson has been committing serious crimes for nearly 40 years. Firearm and drug-trafficking offenses form the backbone of his criminal history. Following his conviction for larceny from a person in 1980, he violated probation by committing more crimes and served several years in prison. Wilson has repeated this basic pattern over the ensuing decades. In 2017, Wilson possessed a firearm and cocaine that he intended to distribute, while on supervised release for a 2012 gun conviction. For this, the Court sentenced him to serve 57 months in prison.

1

Wilson began serving his current sentence on May 29, 2018. Having served less than two thirds of his bottom-of-the-guidelines sentence, he now seeks to shorten it even more by moving for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of July 25, 2020, these directives have already resulted in at least 7080 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, Wilson does not qualify for compassionate release. Although Wilson's heightened risk from Covid-19 based on heart disease qualifies as an "extraordinary and compelling reason[]" for release under

§ 1B1.13(1)(A) & cmt. n.1(A), Wilson is not otherwise eligible for release. Wilson's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support his release.

## Background

Spanning four decades, Wilson's criminal history begins in 1980 when he was convicted of larceny from a person. (PSR ¶ 27). He ultimately received a sentence of four to ten years in prison because he violated probation by committing three more crimes: aggravated assault, attempted carrying a pistol in a vehicle, and assaulting a police officer. (PSR ¶¶ 27–30).

By 1992, he graduated to drug trafficking and his conviction for possessing cocaine with the intent to distribute resulted in a sentence of 5 to 30 years in prison. (PSR ¶ 31). Following his discharge from parole in 2000, Wilson plunged back into drug trafficking by selling more cocaine that same year. (PSR ¶¶ 31–32). In federal court, he pleaded guilty to possessing cocaine with intent to distribute and felon in

possession of a firearm, which landed him in prison for about ten years. (*Id*.).

While on supervised release in 2011, he bought a gun and was caught with it in a car. (PSR ¶ 33). Following his guilty plea, the court sentenced him to serve 63 months in prison. (PSR ¶ 33). After his release from prison and while on supervised release, he committed his current offense in November 2017. (*Id*.).

Based on information that Wilson was dealing drugs again, ATF agents executed a search warrant at his house and seized a gun and ammunition, cocaine, digital scales, a bulletproof vest, and a suspected drug ledger. (PSR ¶ 9; R. 18: Plea Agreement, 38). Wilson kept the gun, cocaine, ledger, and digital scales in close proximity to each other. (R. 18: Plea Agreement, 38). As a result, Wilson pleaded guilty to one count of possessing a firearm as a felon under a Rule 11 agreement in January 2018. (PSR ¶ 6). Four months later, this Court sentenced him to serve 57 months in prison. (R. 22: Judgment, 84).

Wilson began serving his prison sentence on May 29, 2018, and is currently incarcerated at Milan FCI. He is 57 years old, and his projected release date is August 29, 2021. In his motion, he asserts that

he has heart disease, an upper respiratory infection, and has taken immunosuppressant medication (R. 30: Def. Mot., 130–34). Citing these medical conditions and the Covid-19 pandemic, he now moves for compassionate release. *Id.*

## Argument

## I.  The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A.  The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. June 9, 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 833–34. To stop the spread of the disease, the

5

Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 833–34. Social and legal visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone

6

allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.     The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord*

7

04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7080 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. June 2, 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious

9

offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now

10

and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.   The Court should deny Wilson's motion for compassionate release.

A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception,

a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion, which Wilson has done here.

*Second*, even if a defendant exhausts, he must show "extraordinary and compelling reasons" for compassionate release, and release must be "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### A. Wilson has satisfied the statutory exhaustion requirement.

Wilson has complied with § 3582(c)(1)(A)'s mandatory exhaustion requirement. (R. 30-2: Def. Mot., 142–44).

### B. Wilson is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well

developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

14

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Wilson's medical records report a diagnosis of coronary heart disease with a history of two heart attacks (myocardial infarction)—one occurring in 2016 and one in 2017. (Ex. 1, at 4, 6). The CDC has identified this underlying medical condition as a risk factor for severe illness from Covid-19. CDC Risk Factors Given this heightened risk, Wilson has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But Wilson's other health-based claims fall short. First, he alleges an upper respiratory infection makes him vulnerable to severe disease

from Covid-19. (R. 30: Def. Mot., 130-33). This vague claim does not satisfy the threshold under USSG § 1B1.13(1)(A) & cmt. n.1(A). For a medical condition to constitute an extraordinary and compelling reason, he must suffer from a serious medical condition that substantially diminishes his ability to provide self-care in prison and from which he is not expected to recover. *Id*. The medical records show no active tuberculosis (TB) infection. (Ex. 1, at 8, 10). Nor do they show any latent TB infection. *Id*. The cases Wilson cites therefore lack relevance because they involve affirmative TB diagnoses. (R. 30: Def. Mot., 130–33). The problems with his claim do not end there.

Wilson's "upper respiratory infection" diagnosis dates back to April 29, 2009. (Ex. 1, at 7, 13). Although the records describe the status of this condition as "current," this is dubious. For example, Wilson was diagnosed with "mild superficial abrasion chest" on October 11, 2008, and the status of that condition is "current." *Id*. at 14. He likewise was diagnosed with a headache in 2009, which is listed as "current." *Id*. at 13. Both the mild abrasion and headache have likely gone away in the last ten years. More consistent with an older diagnosis of respiratory infection, Wilson's records reveal no *current* complaints of respiratory

16

problems. Nor do they show any *recent* treatments for respiratory conditions. And even if they did, the CDC does not recognize a general upper respiratory infection, much less one from 11 years ago, as a risk factor for severe illness from Covid-19. CDC Risk Factors.

Second, Wilson seizes on his three-day use of the corticosteroid prednisone, starting in April, to claim that he is at heightened risk of severe illness from Covid-19. (R. 30: Def. Mot., 133–34). In a recent update, the CDC delineated between conditions that put people at increased risk of severe illness from COVID-19 from those conditions that *might* do so. CDC Risk Factors. Falling into the latter category, the CDC recognizes that "prolonged use of corticosteroids" *might* put people at an increased risk for severe illness from Covid-19. What's prolonged? The CDC recognizes that corticosteroid therapy is not contraindicated to giving live-virus vaccines when the therapy is short term, defined as less than 14 days. CDC Corticosteroids When considering whether to vaccinate, the immunosuppressive effects of prednisone cause concern when this corticosteroid has been administered for "14 consecutive days." *Id.* Here, Wilson's medical records report a prescription of 50 mg a day—*for three days only*—beginning on April 27, 2020. (Ex. 1, at 2,

16). Wilson's three-day usage comes nowhere near meeting the standard of *prolonged* use. Thus his claim fails.

In sum, Wilson has only one condition (coronary heart disease) that satisfies the first eligibility threshold for compassionate release. His claims about a respiratory infection and use of a corticosteroid miss the mark. This, in turn, deflates his final allegation that a "combination of conditions" exist that support his effort to shorten his sentence. (R. 30: Def. Mot., 134).

As for Covid-19 in Wilson's prison, Milan FCI reports three inmates and one staff confirmed positive presently, three inmate deaths, and 151 recovered inmates and staff. BOP: Covid-19 Prisons (last checked July 25, 2020). On the other side of this coin, Wilson plans on living with his father in Flint if released. (R. 30: Def. Mot., 138; PSR ¶ 49). Genesee County has confirmed over 2550 cases of Covid-19 with 269 deaths since testing began. Michigan Coronavirus Cases (last checked July 25, 2020).

Wilson remains ineligible for compassionate release because he is also a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the

community." It thus prohibits the release of violent offenders, including most drug dealers. *See United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010); *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020). An evaluation of dangerousness under § 3142(g) requires a comprehensive view of community safety—"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam).

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen [spikes in shootings and murders](). There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Wilson's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A). Here, the danger Wilson poses to the community stems from his repetitive

19

harmful actions of trafficking drugs, which triggers a chain reaction of destructive outcomes. Distributing highly addictive drugs harms the health of the addicts that he preys on. Drug trafficking alone is a danger to the community. *See Knight*, 2020 WL 3055987, at *3. Guns and drug dealing predominate his criminal history—both of which threaten public safety. And this is Wilson's third drug-trafficking conviction and seventh felony—which reflects his core belief that he is above the law. His risk of recidivism is high: he has violated the terms of his supervision with near perfect consistency going on 40 years now. Nothing about his adult life suggests that he will follow the law and refrain from endangering the public by distributing more harmful drugs of by violating social distancing protocols, if released here. Wilson therefore remains a danger to the community. This factor forecloses relief here.

### C. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that

20

release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Wilson eligible for compassionate release, reducing his sentence to time served cannot be squared with § 3553(a) sentencing factors.

**Offense conduct.** Due to suspicion that Wilson was dealing drugs, ATF agents searched his house and found the telltale trappings of a drug dealer: a gun, ammunition, a bulletproof vest, cocaine, two digital scales, and a suspected drug ledger. (PSR ¶¶ 9, 10; R. 18: Plea Agreement, 38). Wilson kept the gun, cocaine, ledger, and digital scales

in close proximity to each other. (*Id.*). He intended on sharing some of the cocaine with others. (*Id.*). In short, Wilson was acting as an armed drug dealer while on supervised release.

*History and characteristics.* Wilson's criminal history reaches back to 1980, when he was convicted of larceny from a person. (PSR ¶ 27). He ultimately received a sentence of four to ten years in prison for this offense because he violated probation by committing three more crimes: aggravated assault, attempted carrying a pistol in a vehicle, and assaulting a police officer. (PSR ¶¶ 27–30).

By 1992, he graduated to drug trafficking (53 rocks of crack cocaine and two firearms) and his conviction for possessing cocaine with the intent to distribute landed him in prison for over 5 years. (PSR ¶ 31). Following his discharge from parole in 2000, Wilson plunged back into drug trafficking that same year by selling more cocaine. (PSR ¶¶ 31– 32). After arranging a controlled buy, agents searched Wilson's house and seized three guns with ammunition, 87 grams of crack cocaine, 16 grams of powder cocaine, drug tabulations, and a scale. (PSR ¶ 32). In federal court, he pleaded guilty to possessing cocaine with intent to

distribute and felon in possession of a firearm, which ushered him back into prison for about ten years. (*Id.*).

While on supervised release in 2011, he bought a gun and was caught with it in a car. (PSR ¶ 33). After his guilty plea, the court sentenced him the following year to 144 months' imprisonment under the Armed Career Criminal Act. (*Id.*). But because *United States v. Johnson*, 135 S.Ct. 2251 (2015), rendered Wilson ineligible for sentencing under that Act, Wilson was resentenced, in January 2016, and ordered to serve 63 months in prison. (PSR ¶ 33). After his release from prison and while on supervised release, he committed his current offense in November 2017. (*Id.*).

Adding it up, this case represents his third federal conviction and seventh overall felony. (PSR ¶ 81). All this reveals an entrenched disrespect for the law. Even though he is 57 years old, he has a negligible work history because, in large part, he has been in prison for decades. (PSR ¶¶ 58–63). In the meantime, he fathered eight children. (PSR ¶ 51). But as of 2002, he owed over $57,000 in arrears for child support "never having made a payment." (*Id.*).

Reducing his sentence to time served would improperly minimize the serious nature of his offenses, his criminal history, and his characteristics.

***Protection of the public.*** This consideration should weigh heavily here. Wilson has violated the terms of his supervision with near perfect consistency going on 40 years now. Nothing about his adult life suggests that he will follow the law and refrain from endangering the public if released here. Despite his age, his risk of recidivism is high. To make matters worse, guns and drugs feature prominently in his criminal history—both of which threaten public safety. Shortening his 57-month sentence to time served would unacceptably and undeservedly compromise public safety. In this same vein, the Court cannot reasonably expect Wilson to abide by social distancing rules if released now. Were he to get the coronavirus, he is someone that would likely spread it to others by ignoring social distancing protocols because at his core lies the belief that he need not follow society's rules.

***Just punishment and deterrence.*** His penultimate sentence for possessing a firearm as a felon was 63 months in prison. (PSR § 33). He repeated that offense here—only committing it while also possessing

24

evidence indicative of drug trafficking. Yet he received a more lenient, bottom-of-the-guidelines sentence of 57 months. (R. 22: Judgment, 83–84; PSR ¶ 66). Wilson should not be released because he has served too little of that sentence. The court may consider the amount of time served on a sentence in weighing § 3553(a) factors for compassionate release. *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (rejecting the inmate's claim that the court's consideration of the amount of time served was improper when denying compassionate release.). In *Murphy,* the district court denied compassionate release for an inmate who had served only 32 months of a below guidelines, 60-month sentence for possession with intent to distribute heroin. *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020). So too here. As for time actually served, Wilson has been detained since August 10, 2017. (PSR ¶ 2). In January 2018, the Court sentenced him to 57 months in prison. (R. 22: Judgment, 83–84). As of June 3, 2020, he has served about 60% of his 57-month sentence. (R. 30-9: Def. Mot., 162). Reducing his sentence would flout the precept of imposing graduated sanctions for repeat offenders. A reduction would not represent a just punishment considering his offense and substantial

25

criminal history. Nor would it suffice to specifically deter Wilson

because he would know that he committed a more serious firearm

offense (one with evidence indicative of drug-trafficking) than his last

one and yet received a much lighter sentence.

Section 3553(a) factors weigh against granting release here.

## III. If the Court were to grant Wilson's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Wilson's motion despite the

government's arguments above, the Court should order that he be

subjected to a 14-day quarantine before release.

## Conclusion

Wilson's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

Dated: July 27, 2020

s/BLAINE LONGSWORTH
Assistant United States Attorney
600 Church St., Flint, MI 48502
Phone: (810) 766-5177
blaine.longsworth@usdoj.gov
P55984

### ***CERTIFICATION OF SERVICE***

I hereby certify that on, July 27, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will electronically serve all ECF participants.

s/Jessica Stanton
United States Attorney's Office